IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF FLORIDA
PENSACOLA DIVISION

WILLIE LOGAN,
      Plaintiff,

vs.                          Case No.:  3:15cv437/MCR/EMT

DR. REGULO CALAYCAY, et al.,
      Defendants.
_____/

## REPORT AND RECOMMENDATION

Plaintiff Willie Logan ("Logan"), an inmate of the Florida Department of Corrections ("FDOC"), proceeds pro se and in forma pauperis in this action brought under 42 U.S.C. § 1983.  Presently before the court is Defendants' Motion for Summary Judgment and Memorandum of Law, with supporting materials (ECF Nos. 31, 44).  Logan responded in opposition to the motion (ECF No. 42).

The case was referred to the undersigned for the issuance of all preliminary orders and any recommendations to the district court regarding dispositive matters. *See* N. D. Fla. Loc. R. 72.2(C); *see also* 28 U.S.C. § 636(b)(1)(B)(C); Fed. R. Civ. P. 72(b).  After careful consideration of all issues raised by the parties, it is the opinion of the undersigned that Defendants' motion for summary judgment should be granted.

I.      BACKGROUND AND INTRODUCTION

At all time relevant to this action, Logan was incarcerated at Blackwater River Correctional Facility ("BRCF"), an institution of the FDOC operated by The GEO Group, Inc. (ECF No. 7 at 7–10). He sues four Defendants in this case, all of whom were members of the medical staff at BRCF at all times relevant to this action: Dr. Regulo Calaycay, Advanced Registered Nurse Practitioner ("ARNP") S. Melvin, Registered Nurse B. Cannon-Smith (now known as B. Kallaher), and Licensed Practical Nurse A. Singleton (*id.* at 2; *see also* ECF No. 9). Logan claims that Defendants were deliberately indifferent to his need for treatment of a skin condition (ECF No. 7 at 7–10). He claims that Defendants' failure to properly diagnose and treat his condition caused scarring over 85–90% of his body (*id.*). Logan also claims he suffers from constant itching, and cannot go outdoors because exposure to the sun exacerbates the itching (*id.*). Logan claims that the failure to properly diagnose and treat his condition also caused mental suffering (*id.*). Logan seeks injunctive relief, as well as compensatory and punitive damages (*id.* at 10–11).

Defendants filed a motion for summary judgment, contending the undisputed facts demonstrate that they were not deliberately indifferent to Logan's skin condition (ECF No. 22). Logan filed a response in opposition (ECF No. 42). As explained

below, the court concludes that Defendants are entitled to summary judgment in their favor.

## II.   LEGAL STANDARDS

### A.   <u>Summary Judgment Standard</u>

In order to prevail on a motion for summary judgment, the moving party must show that the nonmoving party has no evidence to support his or her case or present affirmative evidence that the nonmoving party will be unable to prove his or her case at trial.  *See* <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 322–23, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986).  If the moving party successfully negates an essential element of the nonmoving party's case, the burden shifts to the nonmoving party to come forward with evidentiary material demonstrating a genuine issue of fact for trial.  *Id.*  The "mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact."  <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 247–48, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986).  A dispute is "genuine" if the "evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Id.*, 477 U.S. at 248.  A fact is "material" if it "might affect the outcome of the suit under the governing law."  *Id.*  The nonmoving party must show more than the

existence of a "metaphysical doubt" regarding the material facts.  Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586, 106 S. Ct. 1348, 89 L. Ed. 2d 538 (1986).  Speculation or conjecture from a party cannot create a genuine issue of material fact. *See* Cordoba v. Dillard's, Inc., 419 F.3d 1169, 1181 (11th Cir. 2005). "A mere scintilla of evidence in support of the nonmoving party will not suffice to overcome a motion for summary judgment." Young v. City of Palm Bay, Fla., 358 F.3d 859, 860 (11th Cir. 2004); *see also* Celotex Corp., 477 U.S. at 324.  The nonmoving party must either point to evidence in the record or present additional evidence sufficient to withstand a directed verdict motion at trial based on the alleged evidentiary deficiency.  *See* Celotex Corp., *supra*; Owen v. Wille, 117 F.3d 1235, 1236 (11th Cir. 1997) (Rule 56 requires the nonmoving party to go beyond the pleadings and by his or her own affidavits, or by the depositions, documents, affidavits or declarations, admissions, interrogatory answers or other materials on file designate specific facts showing that there is a genuine issue for trial); Hammer v. Slater, 20 F.3d 1137 (11th Cir. 1994).

Evidence presented by the nonmoving party in opposition to the motion for summary judgment, and all reasonable factual inferences arising from it, must be viewed in the light most favorable to him or her.  *See* Adickes v. S. H. Kress & Co.,

398 U.S. 144, 157, 90 S. Ct. 1598, 26 L. Ed. 2d 142 (1970); Jones v. Cannon, 174 F.3d 1271, 1282 (11th Cir. 1999). Nonetheless, the nonmoving party still bears the burden of coming forward with sufficient evidence of every element that he or she must prove. *See* Celotex Corp., 477 U.S. at 317. A motion for summary judgment should be granted if "the movant shows that there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); Celotex Corp., 477 U.S. at 322.

B.      Eighth Amendment Standard

The Eighth Amendment prohibits infliction of "cruel and unusual punishments." U.S. Const. amend. VIII. Stating a claim under that clause requires satisfying two minima (from which the case law has ultimately derived four requirements). First, there must be, objectively speaking, conduct by public officials "sufficiently serious" to constitute a cruel or unusual deprivation—one "denying 'the minimal civilized measure of life's necessities.'" Wilson v. Seiter, 501 U.S. 294, 298, 111 S. Ct. 2321, 115 L. Ed. 2d 271 (1991) (quoting Rhodes v. Chapman, 452 U.S. 337, 347, 101 S. Ct. 2392, 69 L. Ed. 2d 59 (1981)). Second, there must be a subjective intent by the public officials involved to use the sufficiently serious deprivation in order to punish. *See* Wilson, 501 U.S. at 300 ("The source of the intent

requirement is not the predilections of this Court, but the Eighth Amendment itself, which bans only cruel and unusual *punishment*.  If the pain inflicted is not formally meted out *as punishment* by the statute or the sentencing judge, some mental element must be attributed to the inflicting officer before it can qualify.").

In the context of denial of medical care, each of these minima has been more specifically described as encompassing two subsidiary requirements.  To show an objectively serious deprivation, it is necessary to demonstrate, first, an objectively "serious medical need[ ]," Estelle v. Gamble, 429 U.S. 97, 104, 97 S. Ct. 285, 50 L. Ed. 2d 251 (1976), one that, if left unattended, "pos[es] a substantial risk of serious harm," Farmer v. Brennan, 511 U.S. 825, 834, 114 S. Ct. 1970, 128 L. Ed. 2d 811 (1994), and second, that the response made by public officials to that need was poor enough to constitute "an unnecessary and wanton infliction of pain," and not merely accidental inadequacy, "negligen[ce] in diagnosi[s] or treat[ment]," or even "[m]edical malpractice" actionable under state law, Estelle, 429 U.S. at 105–06.[1]  Similarly, to show the required subjective intent to punish, a plaintiff must demonstrate that the public official acted with an attitude of "deliberate indifference," Estelle, 429 U.S. at

---

[1] A corollary to this requirement for a great deal more than negligence is that a public official who does act reasonably in response to a serious medical need "cannot be found liable under the Cruel and Unusual Punishments Clause," Farmer, 511 U.S. at 845, "even if the harm ultimately was not averted," *id.* at 844.

105, which is in turn defined as requiring two separate things:  "aware[ness] of facts from which the inference could be drawn that a substantial risk of serious harm exists [ ] and . . . draw[ing of] the inference," Farmer, 511 U.S. at 837.  Ultimately, there are thus four requirements:  an objectively serious need, an objectively insufficient response to that need, subjective awareness of facts signaling the need, and an actual inference of required action from those facts.  *See* Taylor v. Adams, 221 F.3d 1254, 1258 (11th Cir. 2000).

III.   ANALYSIS

    A.   Material Facts

As this case comes before the court on Defendants' motion for summary judgment, the court is required to view the facts in the light most favorable to Logan, the nonmoving party.  *See* Hairston v. Gainesville Sun Publ'g Co., 9 F.3d 913, 918 (11th Cir. 1993).  The court does so here, referring to Defendants' statement of facts, and taking those facts from the parties' pleadings and summary judgment materials of record.  Fed. R. Civ. P. 56(c); N.D. Fla. Loc. R. 56.1.  Nevertheless, the court observes that what are stated as "facts" herein for purposes of summary judgment review may not be the actual facts.  *See* Montoute v. Carr, 114 F.3d 181, 182 (11th Cir. 1997).

With regard to the factual positions asserted by the parties, the court must apply

the standard set forth in Rule 56(c) of the Federal Rules of Civil Procedure, which

provides in relevant part:

> **(1) Supporting Factual Positions.**  A party asserting that a fact cannot
> be or is genuinely disputed must support the assertion by:
>
> > **(A)** citing to particular parts of materials in the record, including
> > depositions, documents, electronically stored information,
> > affidavits or declarations, stipulations (including those made for
> > purposes of the motion only), admissions, interrogatory answers,
> > or other materials; or
> >
> > **(B)** showing that the materials cited do not establish the absence
> > or presence of a genuine dispute, or that an adverse party cannot
> > produce admissible evidence to support the fact.
>
> . . . .
>
> **(4) Affidavits or Declarations.**  An affidavit or declaration used to
> support or oppose a motion must be made on personal knowledge, set
> out facts that would be admissible in evidence, and show that the affiant
> or declarant is competent to testify on the matters stated.

Fed. R. Civ. P. 56(c) (2010).  Facts asserted in hearsay statements which are not

subject to a hearsay exception, and thus would not be admissible in evidence, are

insufficient to show that a fact is genuinely disputed.

If a party fails to properly support an assertion of fact or fails to properly

address another party's assertion of fact as required by Rule 56(c), the court will

consider the fact undisputed for purposes of the motion for summary judgment, or

grant summary judgment if the moving party's motion and supporting materials—including the facts considered undisputed—show that the moving party is entitled to it.  *See* Fed. R. Civ. P. 56(e)(2, 3) (2010).

Applying these standards, the court conveys the following as the material facts for purposes of Defendants' motion for summary judgment.

On April 25, 2013, Logan declared a medical emergency and reported to BRCF's medical department (ECF No. 31 at 3; ECF No. 31-4, Declaration of Beebe Kallaher, R.N. ¶ 4; ECF No. 31-2, medical records at 1–2).  Emergency medical care is intended for, and only available to, inmates with life threatening conditions or other conditions which require immediate care, while non-life threatening conditions are triaged and treated through the facility's sick-call system (Kallaher Decl. ¶ 4).  Logan told Defendant Nurse Kallaher that he had started itching two days earlier (*id.*).  Logan denied having any prior skin conditions (*id.*).  Nurse Kallaher determined that Logan's skin condition was not life threatening and did not qualify as a medical emergency (*id.*).  Following protocol, Nurse Kallaher instructed Logan to seek medical care through the sick-call process (*id.*).  Nurse Kallaher recalls that Logan consistently attempted to circumvent the sick-call process by declaring medical emergencies and filing inmate requests for specific medical treatment (*id.*).

On April 28, 2013, Mr. Logan returned to the medical department with continued complaints of severe itching and rash (ECF No. 31 at 3; ECF No. 44, Declaration of Regulo C. Calaycay, M.D. ¶ 4; ECF No. 31-2, medical records at 3, 7). Upon consultation with Defendant Dr. Calaycay, a nurse preliminary diagnosed Logan with "Scabies" (*id.*). Scabies is a parasitic and highly contagious disease of the skin caused by an infestation of microscopic mites (*id.*). Dr. Calaycay instructed the nurse to implement the facility's "scabies protocol," which included treatment of the infested skin with permethrin insecticide cream (ECF No. 31 at 4; Calaycay Decl. ¶ 4; ECF No. 31-2, medical records at 3, 7). The topical cream kills the scabies mites by disrupting its central nervous system (*id.*). Permethrin is typically effective against scabies in a single application—although some outbreaks occasionally require re-treatment (*id.*). Benadryl is frequently prescribed alongside permethrin to relieve itching associated with the condition, and was prescribed for Logan (*id.*). The protocol also calls for the identification of clothing, bedding, and other potentially infested areas for appropriate treatment (*id.*). Inmates are also educated on strategies for avoiding re-infection (*id.*). The nurse instructed Logan on how to use his medication, to avoid close contact with other persons, to avoid sharing clothing, towels, etc. with other inmates, to watch for secondary skin infections, and to return

to medical if his condition worsened or did not improve (*id.*).[2]  Logan was advised that

itching might persist for days or weeks following treatment, but that re-treatment

would not likely be necessary (*id.*).

Logan returned to the medical department the next day, April 29, 2013, with the

same complaints of rash and severe itching (Calaycay Decl. ¶ 5; ECF No. 31-2,

medical records at 4–7).  He was seen by Dr. Calaycay (*id.*).  Dr. Calaycay confirmed

the preliminary scabies diagnosis and the current treatment plan (*id.*).  Dr. Calaycay

instructed Logan to access sick-call if he saw no improvement within a week (*id.*).

Dr. Calaycay saw Logan again two days later, on May 1, 2013, for complaints

of itching (ECF No. 31 at 5; Calaycay Decl. ¶ 6; ECF No. 31-2, medical records at 8).

---

[2] Logan argues that the court may not accept Dr. Calaycay's description, based upon Logan's medical records attached to Calaycay's declaration, of what occurred during medical visits for which Calaycay was not present (*see* ECF No. 42 at 5).  Logan has not established that any of the material in or attached to Dr. Calaycay's sworn declaration cannot be presented in a form that would be admissible in evidence at trial.  Courts may consider a hearsay statement in ruling on a summary judgment motion if the statement could be reduced to admissible evidence at trial.  *See* Macuba v. DeBoer, 193 F.3d 1316, 1323–24 (11th Cir. 1999).  Here, the medical records satisfy this standard in that they fall within the business records exception to the hearsay rule.  Fed. R. Evid. 803(6); *see also* Ekokotu v. Fed. Express Corp., 408 F. App'x 331, 335 (11th Cir. 2011) (unpublished) ("[A] person who testifies concerning documents admitted pursuant to the business records exception to the hearsay rule need not have prepared the documents 'so long as other circumstantial evidence and testimony suggest their trustworthiness.'") (quoting Itel Capital Corp. v. Cups Coal Co., 707 F.2d 1253, 1259 (11th Cir. 1983)).  In addition, a statement that is made for—and is reasonably pertinent to—medical diagnosis or treatment may properly be considered because it fits within the hearsay exception for statements made for the purpose of medical diagnosis or treatment.  *See* Fed. R. Evid. 803(4); United States v. Belfast, 611 F.3d 783, 818–19 (11th Cir. 2010).  Therefore, the court rejects Logan's contention that the court may not consider Dr. Calaycay's description, based upon the medical records, of statements made by medical staff during Logan's medical visits.

Calaycay instructed Logan to continue taking the prescribed Benadryl to help alleviate his itching (*id.*).

On May 17, 2013, Nurse Kallaher saw Logan for complaints of continued itching (Kallaher Decl. ¶ 6; ECF No. 31-2, medical records at 9–10).  Nurse Kallaher provided Logan with hydrocortisone cream and an additional dose of Benadryl to alleviate the itching (*id.*).  Nurse Kallaher informed Logan that she would discuss the matter with Dr. Calaycay, but that scabies-related itching was expected and should "gradually decrease" with time (*id.*).  She reminded Logan not to share bedding or clothing with other inmates which could subject him to re-infection (*id.*).

On May 20, 2013, Logan again declared a medical emergency and returned to the medical department for complaints of itching (Calaycay Decl. ¶ 8; ECF No. 31-2, medical records at 7, 11–14, 19).  He was seen by Dr. Calaycay, with Nurse Kallaher present as Dr. Calaycay's nursing assistant (Calaycay Decl. ¶ 8; Kallaher Decl. ¶ 7; ECF No. 31-2, medical records at 7, 11–14, 19).  Since it had been nearly three weeks since the initial scabies treatment, Dr. Calaycay ordered a second round of treatment with the permethrin cream.  According to Dr. Calaycay, it is impossible to know whether the original treatment had been ineffective or if Logan had simply been re-exposed to the mites following his initial treatment (*id.*).  Dr. Calaycay again

prescribed Benadryl for Logan's complaints of itching (*id.*).  Nurse Kallaher instructed

Logan as to application of the cream, reminded him not to share bedding or clothing

with other inmates, and instructed him to return to sick call if his condition did not

improve (Kallaher Decl. ¶ 7).

On May 24, 2013, Logan was seen in the medical department by a nurse, related

to Logan's complaints of severe itching (ECF No. 31 at 6; Calaycay Decl. ¶ 9; ECF

No. 31-2, medical records at 14).  The nurse (who is not a Defendant) instructed

Logan that itching for several weeks was common after a scabies outbreak (*id.*).  The

nurse noted a rash on Logan's right deltoid area and back and scheduled a follow-up

to evaluate progress of the rash (*id.*).

On June 5, 2013, Logan was seen in sick-call with continued complaints of

severe itching (ECF No. 31 at 6; Calaycay Decl. ¶ 10; ECF No. 31-2, medical records

at 16–17, 19).  Logan was referred to Dr. Calaycay, and Calaycay saw him that same

day.  Finding no evidence of a continued scabies infestation, Dr. Calaycay determined

that Logan's scabies outbreak had been successfully treated and resolved (*id.*).

Nonetheless, Dr. Calaycay diagnosed Logan as suffering from two new skin

conditions requiring treatment (*id.*). Dr. Calaycay first diagnosed folliculitis, a

bacterial skin infection on Logan's buttocks (*id.*).  This type of bacterial infection is

commonly introduced by scratching one's skin (*id.*).  To treat this condition, Dr. Calaycay prescribed a ten-day course of the antibiotic Keflex (*id.*).  Dr. Calaycay also diagnosed Logan as suffering from dermatophytosis, an unrelated fungal rash (*id.*). To treat this condition, Dr. Calaycay prescribed the topical anti-fungal skin cream nystatin-triamcinolone (*id.*).

On July 2, 2013, Dr. Calaycay saw Logan for a follow-up regarding his skin conditions, and Nurse Kallaher was present as Dr. Calaycay's nursing assistant (ECF No. 31 at 7; Calaycay Decl. ¶ 11; Kallaher Decl. ¶ 8; ECF No. 31-2, medical records at 20, 22).  Dr. Calaycay noted no re-occurrence of the scabies, and believed that the condition was fully resolved (*id.*).  Dr. Calaycay also noted no continuing indication of the bacterial folliculitis infection and believed that condition to also be fully resolved (*id.*).  Dr. Calaycay noted only the presence of:  (1) "resolving Dermatophytosis," and (2) "dry skin" (*id.*).  Dr. Calaycay elected to continue treatment of the dermatophytosis with the nystatin-triamcinolone cream and ordered vitamin A&D ointment, an over-the-counter product commonly used to treat or prevent dry, rough, scaly, or itchy skin (*id.*).  Logan alleges Dr. Calaycay did not perform a complete visual inspection of his skin during this visit (ECF No. 42,

Logan's Response in Opposition to Defendants' Summary Judgment Motion ("Logan's Response") at 6).

On August 4, 2013, Logan filed an "emergency" formal grievance with the warden, complaining that his skin condition, including constant itching, scratching, bleeding, and discoloration, had not been diagnosed or successfully treated (Logan's Response at 4; ECF No. 1-1 at 8).  Logan complained that the condition initially affected only his arms, but had spread to his entire body and caused scarring (*id.*).  He alleged that he had infected other inmates (*id.*).  On August 15, 2013, the warden and Dr. Calaycay responded that medical staff had assessed and properly treated his condition (ECF No. 42 at 4; ECF No. 1-1 at 10).  The response stated that Logan's allegations that he had not been successfully diagnosed, and that he had infected other inmates, were unfounded (*id.*).

On August 27, 2013, Logan was seen in the medical department by an ARNP regarding his rash and an unrelated sinus issue (Calaycay Decl. ¶ 12; ECF No. 31-2, medical records at 21, 22).  Noting the lingering dermatophytosis fungal rash, the ARNP (who is not a Defendant) stepped-up Logan's treatment by discontinuing the nystatin-triamcinolone and prescribing a four-week course of the anti-fungal pill Lamisil (*id.*).  The ARNP also renewed Logan's prescription for vitamin A&D

ointment for four months, to help with his dry skin (*id.*).  The orders for Lamisil and A&D ointment were sent to the pharmacy (ECF No. 31-2, medical records at 22). According to Dr. Calaycay, the lingering dermatophytosis fungal rash was the last skin condition that required treatment (Calaycay Decl. ¶ 12).

On September 18, 2013, Logan was again seen in the medical department complaining of a rash, and requesting his prescribed ointment and cream (ECF No. 31 at 7–8; Calaycay Decl. ¶ 13; ECF No. 31-2, medical records at 23–24).  The nurse (who is not a Defendant) noted that Lamisil was one of Logan's current medications (ECF No. 31-2, medical records at 23–24).  The nurse found no signs of any rash or any other condition requiring medical intervention (ECF No. 31 at 7–8; ECF No. 31-2, medical records at 23–24).  The nurse noted only "darker and lighter skin pigmentation" (*id.*).  According to Dr. Calaycay, this hyperpigmentation is a known possible side-effect of scabies but is not itself a condition requiring medical treatment (*id.*).  The nurse issued Logan four packs of vitamin A&D ointment from her cart and agreed to check with the pharmacy on the status of Logan's vitamin A&D ointment and nystatin-triamcinolone (which had been replaced with Lamisil on August 27, 2013) (*id.*).  The nurse also instructed Logan to watch for signs of a skin infection, such as redness, swelling, purulent drainage, or pain (*id.*).  The nurse instructed Logan

to return if his symptoms worsened, did not improve, or if any new symptoms developed (*id.*).

On October 1, 2013, Logan was seen in the medical department complaining that he had not received the vitamin A&D ointment (ECF No. 31 at 8; Calaycay Decl. ¶ 14; ECF No. 31-2, medical records at 25).  He was seen by a nurse (who is not a Defendant), who found that "no treatment [was] required" and that Logan's prescription for the ointment did not expire until December 27, 2013 (*id.*).  The nurse instructed Logan to access sick-call as needed (*id.*).

On October 18, 2013, Logan submitted an informal grievance to the medical department, complaining that the medication he was receiving was not working (Logan's Response at 4–5).  He also complained about being charged $5.00 for each sick-call visit (*id.*).  The grievance was denied on November 1, 2013 (*id.*).

On November 6, 2013, Logan filed a formal grievance to the warden regarding "the overpayment of his ongoing medical condition" (Logan's Response at 5).  The warden and Dr. Calaycay denied the grievance (*id.*).

On January 22, 2014, Logan filed a sick-call request complaining of small bumps and hives that had turned into sores (Logan's Response at 5).  On January 24, 2014, Logan was seen in the medical department by a nurse (who is not a Defendant),

who noted that Logan complained of itching and that he requested a refill of his vitamin A&D ointment and nystatin-triamcinolone cream (ECF No. 31 at 8; Calaycay Decl. ¶ 15; ECF No. 31-2, medical records at 26, 31). The nurse again found that Logan suffered from no conditions requiring medical treatment (*id.*). The nurse noted only that Logan had "dry skin and scratches" and observed that he "did not have signs or symptoms of an actual rash/yeast/fungus that would require Nystatin" (*id.*). The nurse ordered a renewal of Logan's vitamin A&D ointment (*id.*).

On March 2, 2014, Logan filed a grievance stating that he had not received his vitamin A&D ointment (Logan's Response at 5; Calaycay Decl. ¶ 16; ECF No. 31-2, medical records at 27). Logan reported that the A&D ointment was the only treatment that relieved the pain and itching (Logan's Response at 5). On March 3, 2013, Nurse Kallaher responded that the A&D ointment was now "non-formulary," meaning that the particular product was no longer covered by insurance and would only be provided by medical staff if it was specifically medically necessary (Calaycay Decl. ¶ 16; ECF No. 31-2, medical records at 27).

On March 4, 2014, Logan filed another grievance complaining that his prescription for A&D ointment had not been renewed (*see* ECF No. 7, Amended Complaint at 7; ECF No. 1-1 at 3). Logan complained that medical staff charged him

$5.00 for the sick-call visit on March 2, but did not renew the prescription (*id.*).  Nurse Kallaher responded that the clinician had determined that Logan's condition did not require Eucerin lotion (*id.*).  Kallaher further advised that lotion from the canteen would help Logan's dry skin, and that it was available for less than $4.00 (*id.*).

On March 25, 2014, Logan was seen in sick-call for complaints of a rash (ECF No. 31 at 9; Calaycay Decl. ¶ 17; ECF No. 31-2, medical records at 28–29).  However, as had been the case since at least September 18, 2013, the nurse (who is not a Defendant) again found no indication of any rash or other skin condition requiring medical treatment (*id.*).  The nurse noted only a "discoloration of [the] skin," which did not require treatment (*id.*).

On April 9, 2014, Dr. Calaycay replaced the A&D ointment with Hydrocerin/Eucerin moisturizing cream to help with Logan's dry skin (ECF No. 31 at 9; Calaycay Decl. ¶ 18; ECF No. 31-2, medical records at 30, 31).  This is an over-the-counter topical skin cream commonly used to treat or prevent dry, rough, scaly, or itchy skin.  "Hydrocerin" is the generic name for "Eucerin" (*id.*).  They are the same product (*id.*).

On April 18, 2014, Logan submitted a formal grievance to the warden, complaining that he was constantly itching, and he had "bumps and hives" all over his

body (Amended Complaint at 7–8; ECF No. 1-1 at 4–5). Logan complained that he never received medical treatment for the scabies until it was too late (*id.*). He requested referral to a skin specialist (*id.*). The warden responded that Logan's clinician did not feel that referral to a specialist was necessary (*id.*). The warden advised Logan that he was scheduled to see the clinician in June, and that he should access sick-call in the meantime if he was experiencing problems (*id.*). Logan appealed to the FDOC's Central Office, but the appeal was denied (Amended Complaint at 8).

On May 14, 2014, Logan was seen in sick-call for complaints of a rash over his body and itching (ECF No. 31 at 9; Calaycay Decl. ¶ 19; ECF No. 31-2, medical records at 32–33). A nurse (who is not a Defendant) noted possible lesions, which were later confirmed to be merely scarring from the scabies outbreak (Calaycay Dec. ¶ 19). The nurse referred Logan to a clinician to determine if a prescription was necessary (Calaycay Decl. ¶ 19; ECF No. 31-2, medical records at 32–33).

On May 21, 2014, Logan was seen by Defendant Advanced Registered Nurse Practitioner ("ARNP") Sheila Melvin for the lesions (ECF NO. 31 at 10; Calaycay Decl. ¶ 20; ECF No. 31-3, Declaration of Sheila Melvin, ARNP ¶ 3, ECF No. 31-2, medical records at 34). Logan complained to ARNP Melvin of rash and itching over

the last year and starting after an episode of scabies, as well as occasional welts and hives (*see id.*).  Although ARNP Melvin observed evidence of prior scabies scaring covering Logan's arms, trunk, and lower extremities, ARNP Melvin found that there was "no actual rash present" (*id.*).  ARNP Melvin diagnosed Logan with pruritus (itchy skin) "likely secondary to post scabies outbreak" (*id.*).  ARNP Melvin correctly noted (according to Dr. Calaycay) that "post scabies pruritus can last for months to years without any re-exposure to scabies" (*id.*).  Nonetheless, due to Logan's frequent complaints, ARNP Melvin also scheduled Logan for blood tests to be sure his itching was not related to a more serious underlying condition (*id.*).  According to Dr. Calaycay, no such condition has ever been diagnosed or is believed to exist (Calaycay Decl. ¶ 20).

On July 2, 2014, Logan submitted a request for ARNP Melvin to see an outside specialist (ECF No. 31 at 10; ECF No. 31-2, medical records at 35).  A nurse responded that he would request an opinion from ARNP Melvin (*id.*).  Apparently unhappy with the response (all such requests were denied), Logan filed a duplicate request on July 13, 2014 (ECF No. 31 at 10; ECF No. 31-2, medical records at 36). Then-Medical-Records-Clerk Defendant Amber Singleton correctly responded (according to Dr. Calaycay) that:  "If the clinician has found no reason to send you out

to a specialist, there will not be a consult given to do so." (ECF No. 31 at 10–11; ECF No. 1-1 at 6; Calaycay Decl. ¶ 21).   Defendant  Singleton did not deny Logan's request—she merely conveyed that his request had already been denied by a clinician (Calaycay Decl. ¶ 21).

On July 15, 2014, Logan complained that Defendant Singleton had "intercepted" his request to ARNP Melvin (ECF No. 31 at 11; ECF No. 7 at 8; ECF No. 1-1 at 7; Kallaher Decl. ¶ 10; ECF No. 31-2, medical records at 37). Nurse Kallaher responded to Logan's grievance as follows:  "[I]f the treatment you have been given is not effective or you want to follow up with the clinician, you must access sick call" (*id.*).   According to Dr. Calaycay, this was a correct response (Calaycay Decl. ¶ 21).

On August 4, 2014, Logan submitted a formal grievance to the warden, complaining that the medical department was not treating his skin condition (ECF No. 1-1 at 8).  The warden denied the grievance upon review of Logan's medical records (*id.* at 9–10).

On August 18, 2014, though a chart review, ARNP Melvin renewed Logan's Hydrocerin/Eucerin cream for three months (ECF No. 31 at 11; Calaycay Decl. ¶ 22; Melvin Decl. ¶ 4; ECF No. 31-2, medical records at 38, 41).  ARNP Melvin later

learned that inmates frequently requested skin cream and other over-the-counter medications (such as Tylenol and Motrin) from the nurses and clinicians to avoid paying for the items in the canteen (Melvin Decl. ¶ 4).

On October 29, 2014, Logan requested renewal of the Hydrocerin/Eucerin cream (ECF No. 31-2, medical records at 39).  On November 11, 2014, Dr. Calaycay renewed the cream for an additional three months (Calaycay Decl. ¶ 22; ECF No. 31-2, medical records at 40–41).

On February 3, 2015, finding no continuing medical need, ARNP Melvin denied Logan's request for renewal of the Hydrocerin/Eucerin cream (Amended Complaint at 9; ECF No. 31 at 11; Calaycay Decl. ¶ 23; Melvin Decl. ¶ 5; ECF No. 31-2, medical records at 43–44).  ARNP Melvin determined that although originally prescribed in July of 2013 following bouts with scabies, folliculitis, and dermatophytosis, Logan had not had a skin condition requiring medical treatment since at least September of 2013 (*id.*).  ARNP Melvin determined that Logan's continued complaints of dry/itchy skin—unrelated to any actual medical condition requiring treatment—did not require the continued provision of special order skin creams (*id.*).  ARNP Melvin was aware that moisturizing skin cream sufficient to meet Logan's dry skin needs was available to him in the canteen (*id.*).

On March 1, 2015, Logan declared a medical emergency complaining of a rash on his right forearm (ECF No. 31 at 12; Calaycay Decl. ¶ 24; ECF No. 31-2, medical records at 46–47).  The nurse (who is not a Defendant) determined that there was "no treatment necessary," and that Logan's condition was "non-emergent at this time" (*id.*).  The nurse instructed Logan to only rub gently itching skin, and not to scratch it (ECF No. 31-2, medical records at 46–47).  The nurse also instructed Logan to access sick-call to return if symptoms worsened, did not improve, or if any new symptoms developed (*id.*).

Because medical staff had determined that Logan did not have a skin condition requiring any treatment, and because moisturizing skin cream that was sufficient to meet Logan's dry skin needs was available to him in the canteen, Nurse Kallaher denied Logan's requests for renewal of the Hydrocerin/Eucerin cream and advised him that suitable lotion was available in the canteen for less than $4.00 (which is less than the $5.00 cost to an inmate of a sick call request)[3] (Kallaher Decl. ¶ 11; ECF No. 31-2, medical records at 45, 48, 49).  Also, because medical staff determined that Logan did not have a skin condition requiring any treatment, Logan's various requests

---

[3] The court notes that Logan's inmate account statement submitted with his IFP motion reflects that he receives average monthly deposits of approximately $49.00 in his inmate account (*see* ECF No. 2 at 3).

Case No.:  3:15cv437/MCR/EMT

to be referred to an "outside" skin specialist were denied as not medically indicated

or necessary (Calaycay Decl. ¶ 25; ARNP Melvin Decl. ¶ 6; ECF No. 31-2, medical

records at 50).

     B.   <u>Discussion</u>

As previously discussed, to prove that any Defendant was deliberately

indifferent to Logan's medical needs, Logan must prove: "(1) subjective knowledge

of a risk of serious harm; (2) disregard of that risk; (3) by conduct that is more than

gross negligence." <u>Goodman v. Kimbrough</u>, 718 F.3d 1325, 1332 (11th Cir. 2013)

(internal quotation marks omitted).  Proof of deliberate indifference requires a great

deal more than does proof of negligence:   "To be deliberately indifferent a prison

official must know of and disregard an excessive risk to inmate health or safety; the

official must both be aware of facts from which the inference could be drawn that a

substantial risk of serious harm exists, <u>and he [or she] must also draw the inference</u>."

*Id.* (internal quotation marks omitted).

In other words, a plaintiff in Logan's position must show not only that there

was a substantial risk of serious harm, but also that a Defendant "subjectively knew

of the substantial risk of serious harm and that [that Defendant] knowingly or

recklessly disregarded that risk by failing to take reasonable measures to abate it."

Hale v. Tallapoosa Cnty., 50 F.3d 1579, 1583 (11th Cir. 1995) (citation omitted).

Whether prison officials had the requisite awareness of the risk "is a question of fact

subject to demonstration in the usual ways, including inference from circumstantial

evidence, and a factfinder may conclude that a prison official knew of a substantial

risk from the very fact that the risk was obvious." Farmer, 511 U.S. at 842 (citation

omitted). At the same time, the deliberate indifference standard—and the subjective

awareness required by it—is far more onerous than normal tort-based standards of

conduct sounding in negligence. Goodman, 718 F.3d at 1332 (citation omitted). And

needless to say, to defeat a motion for summary judgment, Logan must adduce

specific evidence from which a jury could reasonably find in his favor; "[t]he mere

existence of a scintilla of evidence in support of [his] position will be insufficient."

Anderson, 477 U.S. at 252.

Logan makes three arguments in opposition to summary judgment.  First,

Logan argues that Defendant Nurse Kallaher was deliberately indifferent on May 17,

2013, because despite the fact that Dr. Calaycay had instructed Logan on April 29,

2013, to access sick-call if he saw no improvement within a week, Nurse Kallaher

only provided Logan with hydrocortisone cream and additional Benadryl when Logan

reported to her that his condition had not improved  (ECF No. 42 at 6).

Logan does not dispute that during the visit of May 17, 2013, Nurse Kallaher advised Logan that she would discuss his condition with Dr. Calaycay.  Logan also does not dispute that Dr. Calaycay examined him three days later, on May 20, with Nurse Kallaher present.  During that visit, Dr. Calaycay ordered a second round of treatment with the permethrin cream for scabies.  According to Dr. Calaycay, it was impossible to know whether the original treatment had been ineffective or if Logan had simply been re-exposed to the mites following his initial treatment.  Dr. Calaycay also prescribed Benadryl for Logan's complaints of itching.  Nurse Kallaher instructed Logan as to application of the cream, reminded him not to share bedding or clothing with other inmates, and instructed him to return to sick call if his condition did not improve.

The evidence does not support a reasonable inference that Nurse Kallaher inferred, from the facts of which she was aware on May 17, 2013, that providing Logan with hydrocortisone cream and additional Benadryl, and consulting with Dr. Calaycay about the status of Logan's condition, posed a substantial risk of serious harm to Logan's health.  Kallaher's assessment did not evince an attitude of deliberate indifference or, correspondingly, a subjective intent to punish.  If the three-day delay (between May 17 and May 20) in Dr. Calaycay's reassessing Logan was attributable

to Nurse Kallaher, it suggests at most negligence, but not deliberate indifference. Therefore, Logan's argument is insufficient to defeat Defendants' motion for summary judgment.

Logan's second argument is that even though an ARNP prescribed Lamisil on August 27, 2013, to treat the lingering dermatophytosis fungal rash, the Lamisil was never actually provided to him (ECF No. 42 at 6).  Accepting Logan's allegation as true, the evidence does not support a reasonable inference that any Defendant subjectively knew that Logan had not received the Lamisil, let alone that Logan's failure to receive it was due to any Defendant's deliberate indifference, as opposed to negligence.   Logan's argument is insufficient to defeat Defendants' motion for summary judgment.

Logan's third argument is that Dr. Calaycay's statement, in September and October of 2013, that Logan did not have any condition requiring treatment, is "incorrect" (ECF No. 42 at 6).  In the prison context, the court must "distinguish between evidence of disputed facts and disputed matters of professional judgment." Beard v. Banks, 548 U.S. 521, 530, 126 S. Ct. 2572, 165 L. Ed. 2d 697 (2006).   A medical decision not to pursue a particular course of diagnosis or treatment is a classic example of a matter for medical judgment, an exercise of which does not represent

cruel and unusual punishment.  *See* <u>Estelle</u>, 429 U.S. at 107–08.  Moreover, "[w]here a prisoner has received . . . medical attention and the dispute is over the adequacy of the treatment, federal courts are generally reluctant to second guess medical judgments and to constitutionalize claims that sound in tort law."  <u>Hamm v. Dekalb Cnty.</u>, 774 F.2d 1567, 1575 (11th Cir. 1985) (quotation omitted).

Dr. Calaycay's determination, that after medical staff diagnosed and ordered treatment for Logan's scabies, folliculitis, and dermatophytosis, Logan did not have a skin condition which required medical treatment, is a matter of medical judgment. Logan's disagreement with the medical judgment of Dr. Calaycay and his staff is insufficient to defeat Defendants' motion for summary judgment.

## IV.   CONCLUSION

Viewing the evidence in the light most favorable to Logan, Defendants have successfully negated the "deliberate indifference" element of Logan's Eighth Amendment claim, and Logan has not come forward with evidentiary material demonstrating a genuine issue of fact for trial as to this element.   Therefore, Defendants are entitled to summary judgment.

Accordingly, it is respectfully **RECOMMENDED**:

1.      That Defendants' motion for summary judgment (ECF No. 31) be

**GRANTED**.

2.      That the clerk of court be directed to enter judgment in favor of

Defendants and against Plaintiff and close the file.

At Pensacola, Florida, this 13<u>th</u> day of February 2017.


<u>/s/ *Elizabeth M. Timothy*             </u>
**ELIZABETH M.  TIMOTHY**
**CHIEF UNITED STATES MAGISTRATE JUDGE**


<u>**NOTICE TO THE PARTIES**</u>

**Objections to these proposed findings and recommendations must be filed within fourteen (14) days after being served a copy thereof.  <u>Any different deadline that may appear on the electronic docket is for the court's internal use only, and does not control</u>.  A copy of objections shall be served upon all other parties.  If a party fails to object to the magistrate judge's findings or recommendations as to any particular claim or issue contained in a report and recommendation, that party waives the right to challenge on appeal the district court's order based on the unobjected-to factual and legal conclusions.  *See* 11th Cir. Rule 3-1; 28 U.S.C. § 636.**